(29 Misc. Rep. 215.)

## In re McDADE.[1]

(Supreme Court, Special Term, Monroe County. September, 1899.)

PRIMARY ELECTIONS—BALLOTS—RECOUNT OF VOTES.

Under Laws 1899, c. 473, § 6, providing for determining the size, color, weight, and texture of the paper to be used for ballots for primary elections, and for the printing thereon, and declaring that all ballots not conforming to such provisions shall not be counted, and section 7, providing against marking ballots for identification, ballots which have pasted upon them slips of paper containing printing different from that on the original ballot are invalid.

[1] Reversed on appeal. See 60 N. Y. Supp. 333.

Application by James A. McDade for a recount of votes cast at the Democratic primary election in the Second district of the Ninth ward of Rochester. Granted.

Smith & Gibbs, for board of inspectors and George E. Warner. Frank J. Hone, for petitioner and Charles B. Ernst.

DAVY, J. This is a proceeding under the primary election law (chapter 473, Laws 1899) to review the action of the inspectors in canvassing and making their return of the number of ballots voted at the Democratic primary election held in the Second primary district of the Ninth ward of the city of Rochester. The principal question raised in these proceedings is whether the five paster ballots in question, known as the "Warner Ballots," are legal ballots, and should be counted. The pasters consisted of a slip of paper on which had been printed the names of a set of delegates to the city convention, different from the names printed upon the original ballot, and these pasters were pasted upon the ballots voted. In one ballot a slip was pasted at the head of the ticket, over the names of the delegates to the county convention, so that two sets of delegates to the city convention appeared on this ballot. It appears that one of the watchers protested to the counting of the paster ballots, and they were then marked on the back by the inspectors and counted, and afterwards returned to the county clerk.

Section 6 of the act provides, in substance, that the custodian of primary records, who in this case is the county clerk of Monroe county, shall, not later than 20 days prior to the holding of any official primary election, prescribe the size, color, weight, and texture of the paper to be used for the ballots at such primary election, and prepare samples thereof, which ballots shall have printed or written upon their face the party name, the assembly district or ward number, if any, the election district number, the names of the positions to be filled, and the names of the persons voted for to fill such positions; that all printing shall be in black ink; that the custodian of primary records shall prepare a sample ballot, which he shall exhibit for inspection, and which shall be furnished to the committees or electors applying therefor; that the ballot voted shall correspond to the sample ballot; that ballots not conforming to the provisions of this section shall not be counted at any official primary election. Section 7 of the act also provides that no ballot shall be in any way marked for identification.

It has been frequently held by the courts of this state that the legislature has the constitutional power to place any and all restrictions about a ballot, or about the act of voting, which in its judgment are necessary or proper to secure secrecy and independent action by the voter, or to make intimidation, cheating, or bribery at the polls impossible, or as nearly so as can be done by legislative enactment. And where the legislature has in clear and explicit words said that where ballots have been voted that do not conform to the provisions of the act in size, color, weight, and texture of the paper as prescribed by the custodian of primary records, they shall

not be counted at any official primary election, the requirements of the statute must be obeyed. People v. Board of Canvassers of Onandaga Co., 129 N. Y. 412, 29 N. E. 327. It was urged by counsel upon the argument that the statute did not prohibit the use of paster ballots, and therefore the inspectors had a right to count them. The law says that ballots that do not conform to the provisions of section 6 of said act shall not be counted. The rule is well settled that, where the law directs a thing to be done in a certain manner, it implies that it shall not be done in any other manner. Do the five paster ballots in question conform to the statute? Do the pasters change the weight and texture of the paper authorized to be used for ballots? The statute authorizes the use of but one thickness of paper. The ballots with the pasters on them contain two thicknesses, which make these ballots different in weight and thickness. If a ballot of two thicknesses may be used, I can see no reason why a ballot of half a dozen thicknesses may not also be used, and thereby ignore the requirements of the statute as to the weight and texture of the paper. If the statute permits the use of paster ballots, what is there to hinder the friends of rival candidates for office from using paster ballots with the intent to deceive and induce corrupt and ignorant persons to vote them? If such a construction is to be given to the statute, instead of the ballot being a secret one, and a protection to the voter from fraud and imposition, it would tend to increase the opportunities for fraud and corruption. It is evident that the legislature, by the passing of this act, intended to give the people a secret primary ballot law. The act provides that each voter shall have a place to prepare his ballot, secluded from all observation, so that it cannot be known to others, either at the time he votes or subsequently, for what person or set of delegates he voted. This law, which cannot be too highly commended, tends to promote fair and independent action on the part of the voter, by enabling him to escape those influences which otherwise might be brought to bear upon him to prevent the real expression of his sentiments.

It is urged that to deprive a candidate of the right to have such a ballot counted in his favor would be to interfere with the privilege of the voter to cast his ballot for the candidate of his choice. Under the provisions of the primary election law, every voter is guarantied the right to vote for any person for any office, whether the name of such person is printed upon the ballot or not. The booths required to be furnished, and the facilities provided therein to enable the voter to prepare his ballot, amply secure to him every right of a voter. The mere fact that methods thus provided may be less convenient than the use of a paster furnishes no sufficient reason for changing or modifying the requirements of the law wisely designated for the purposes already mentioned. The inconvenience would have been no greater than in any other case where the voter writes the name of the delegates on the ballot. There is no reference to a paster in the statute, but it expressly says that the ballot shall be prepared by printing or writing the names of the candidates thereon.

In considering the statute we are to keep steadily in mind the evi-

dent intention of the legislature in its enactment. It is plain that one of the most prominent ends sought to be obtained is that of absolute secrecy. Any mark or distinguishing feature on the ballot which would enable a person other than the voter himself to identify the ballot, and find out how the elector had voted, was intended to be strictly prohibited. The law expressly provides that every voter, immediately upon leaving the booth, shall deliver his ballot to one of the primary inspectors, folded in such a way that none of the printed or written matter on the inside thereof shall be visible. Secrecy is, as stated, one object of the statute. The other objects are to secure the independence of the voter and the purity of elections. It was designed to inaugurate an important departure from the mode of voting and counting votes at primaries which had existed in this state prior to its passage. In this law the statute states with great exactness that the custodian of primary records shall determine the size, color, weight, and texture of the paper to be used for the ballots, and that he shall prepare a sample thereof, and that the paper shall be of such weight and texture as to make it impossible to read or decipher the printed matter on the inside of the ballot when it shall be folded. The law further provides what shall be written or printed upon the face of the ballot. Can it be said that the printed matter on the paster is printed or written upon the face of the ballot? The face of the ballot can only mean the face or surface of the paper authorized to be used by statute, and that the paster ballot, while it contains printed matter, is not printed or written upon the face of the official ballot, but that it is printed upon another piece of paper, which is pasted over the legal ballot. The act also provides that no ballot shall be in any way marked for identification. Assume that a voter was offered a certain sum of money provided he voted for certain delegates. Could there be any more complete and perfect manner of marking his ballots for identification, and of ascertaining when the ballots were counted how he voted, than by using a paster? A ballot that is pasted over another clearly marks it for identification, and is not such a ballot, in weight and texture of paper, as the custodian of primary records is required to provide under this act. If the voter is permitted to paste his ballot over another ballot for the purpose of identification, it would remove all secrecy from the act of voting, and thus the purpose of the law would be defeated.

It is a well-known fact that primary elections in the past have been largely controlled by individuals who have not hesitated to pay money to voters for the purpose of having them vote the ticket advocated by such persons. In the use of money at the primary elections it has been frequently discovered that many persons who were willing to negotiate their votes accepted money, but did not vote as they had agreed. The practice then grew up of making a promise to pay upon proof of the depositing of the vote, and various schemes were devised whereby it might be ascertained at the counting of the ballots, by a mark or otherwise, whether or not certain votes which had been purchased had been actually voted, and the payments were made upon proof that the ballots had been voted.

Secrecy, therefore, lies at the foundation of this provision of the act, and any construction which will permit ballots to be counted which reveal the way the person voted is contrary to the true policy and intent of the law. I must therefore hold that the paster ballots were voted in violation of the plain provisions of the statute, and it was the duty of the primary inspectors to treat them as void, and not to count them.

It is urged that the intent of the voter must be taken into consideration, and that the ballots were cast in good faith by the voters who believed, under the advice which they had received from the custodian of primary records, that they had a legal right to vote a paster ballot. I am inclined to think that the innocence and good faith of the party voting the ballots are wholly immaterial, and cannot be taken into consideration in determining the validity of such a ballot. The question before the court is not what the intention of the voter was, or whether he was deceived or misled by the statement of others. The question is, does the ballot conform to the legal requirements of the statute? In the case of People v. Board of Canvassers of Richmond Co., 156 N. Y. 47, 50 N. E. 428, Judge O'Brien, in construing the statute under the general election law, says:

"That statute declares that, when a ballot discloses certain marks or physical appearance, it shall not be counted; and we have the ballots before us, with certain marks and appearances upon them, and whether they come within the condemnation of the statute is a pure question of law. Whether the condition of the ballot was due to the voluntary or involuntary act of the voter is a matter of no consequence. Our duty is simply to apply a statute to conceded facts."

And again, at page 49, 156 N. Y., and page 429, 50 N. E., he says:

"It should here be observed that when the statute declares that ballots cast by the electors and found in the ballot box in certain form and in certain conditions, bearing on their faces certain physical appearances, shall not be counted, there is nothing to do but obey the law, even though the intention of the voter be manifest. The first step, therefore, in the inquiry, is to ascertain what the statute is, and what it means; always bearing in mind that one of the main purposes of its enactment was to prevent corruption and bribery at the election, and to render impossible the identification of the ballot by any device whatever after being deposited in the ballot box."

It has been held in other states that a ballot printed in violation of the statute is void, and that a ballot was properly rejected which did not conform, in length, in color, and in other minor respects, to the statute prescribing the form of ballots to be used. Reynolds v. Snow, 67 Cal. 497, 8 Pac. 27; Fletcher v. Wall, 172 Ill. 427, 50 N. E. 230; Lawlor's Contested Election, 180 Pa. St. 566, 37 Atl. 92; State v. McKinnon, 8 Or. 493; People v. Collin, 19 App. Div. 457, 46 N. Y. Supp. 701; People v. Board of Aldermen, 157 N. Y. 431, 52 N. E. 181; People v. Board of Canvassers of Onandaga Co., 129 N. Y. 395, 29 N. E. 327; Talcott v. Philbrick, 59 Conn. 472, 20 Atl. 436. In West v. Ross, 53 Mo. 350, the statute provided that no ballot not numbered should be counted, and the question arose as to whether ballots cast for a successful candidate for county clerk, not numbered, should be excluded from the count. It was conceded that

no fraud was intended by the inspectors in failing to number the ballots, but it was occasioned by an inadvertence on their part. It further appeared that the number of ballots counted corresponded with the number of voters appearing on the poll list. The court, however, held that these votes were void, and in its opinion said:

"This case may be a hard case, and doubtless is, but the legislative enactment is clear, and, although it may deprive a portion of the citizens of the county of their right to be heard in the election of a clerk at one election, it is better that they should suffer this temporary privation than that the courts should habituate themselves to disregard or ignore the plain law of the land in order to provide for hard cases."

The same rule is applicable to this case. It may be hard to deprive the five Democratic voters of this ward, who used paster ballots, of the right to vote at the primary election; but it is better that they should be deprived of their votes, than that the court should ignore the provisions of this act which are intended to reform and purify the mode of elections at primaries, and to prevent corruption and bribery at the polls.

After a very careful consideration of the primary election law and the authorities of this and other states pertaining to similar statutes, I have reached the conclusion that none of the five paster ballots should have been counted. The primary inspectors, therefore, must reconvene and recount the votes, reject and not count the five paster ballots in question, and make their return accordingly.